**Anita BAKER, Plaintiff, Appellee,**

v.

**DALKON SHIELD CLAIMANTS TRUST, Defendant, Appellant.**

**No. 98–1214.**

United States Court of Appeals, First Circuit.

Heard July 30, 1998.

Decided Sept. 23, 1998.

Paul F. Strain with whom Terri L. Turner, Venable, Baetjer and Howard, LLP, Richard A. Oetheimer and Goodwin, Proctor & Hoar LLP were on brief for appellant.

Robert V. Costello with whom Schneider, Reilly, Zabin & Costello, P.C., Neil Rossman and Rossman, Rossman & Eschelbacher were on brief for appellee.

Before SELYA, BOUDIN and LIPEZ, Circuit Judges.

BOUDIN, Circuit Judge.

Dalkon Shield Claimants Trust (the "Trust") appeals from a judgment in favor of Anita Baker for damage allegedly caused by the Dalkon Shield contraceptive intrauterine device (the "IUD"). The background facts, drawn from the trial record, are largely undisputed. In October 1972, Anita Baker un-

derwent a routine gynecological examination that revealed that she had a slightly enlarged right ovary and that trichomonas, a sexually transmitted organism, was present in her Pap smear. Baker had a Dalkon Shield IUD inserted in July 1973 and removed in September 1974 after suffering severe discomfort.

In October 1974, Baker went to obstetrician/gynecologist Dr. Miles St. John. He examined Baker and fit a diaphragm for her. In the course of his examination, he noted hardness and slight irregularity in the uterus. His diagnosis was that it could have been caused by pelvic inflammatory disease ("PID") or by a fibroid tumor or by endometriosis. Concerned about this development, he asked Baker to return for a follow-up visit in three months. In January 1975, Baker returned to Dr. St. John; he reexamined her and concluded that the problem had resolved itself. He also asked Baker to return in six months but she did not do so.

In January 1979, Baker had a laparoscopy—a visual inspection through a scope—to determine why she was having difficulty conceiving. The procedure revealed that Baker had a fibroid tumor in her uterus and adhesions in her left and right fallopian tubes. It also indicated damage consistent with PID. In February 1979, she underwent exploratory and reconstructive surgery that confirmed that her infertility was due to PID. In December 1979, Baker underwent extensive reconstructive surgery and microsurgery on her reproductive organs. Sometime later, after an ectopic pregnancy, Baker had her right fallopian tube removed and her left fallopian tube sealed.

In 1980, Baker filed a complaint against A.H. Robins Company, Inc. in the district court for negligence, breach of warranty, and fraud, claiming that the Dalkon Shield IUD was responsible for her PID and subsequent infertility. There ensued a substantial delay due to the bankruptcy of A.H. Robins, the establishment of the Trust, and the process-ing of Baker's claim through the Trust's claims settlement process. In January 1995, Baker was certified by the bankruptcy court in charge of the A.H. Robins bankruptcy to reopen the case and proceed with litigation. The aspect of that case that concerns us on this appeal relates to chlamydia, a sexually transmitted disease now widespread in the United States.

In 1996, two chlamydia titer tests were performed upon a sample of Baker's blood.[1] One was performed at the Trust's request, the other at Baker's. Both titer tests were positive for chlamydia, indicating that Baker had been infected by chlamydia at some earlier time. This was of importance to the defense because—in addition to disputing that Dalkon Shield IUDs could cause the PID and the effects claimed by Baker—the Trust planned to point to chlamydia as an alternative, exculpatory cause of her injury.

In October 1997, immediately before the trial, Baker moved *in limine* to exclude the evidence of the two 1996 chlamydia antibody titer tests as remote in time and unduly prejudicial. In support of their admissibility, the Trust submitted an affidavit by Dr. Mary Jane Minkin, a gynecologist. Dr. Minkin's affidavit explained that the medical community considered titer tests reliable evidence of prior infection by chlamydia and that chlamydia is the most common cause of the type of PID that the Trust claimed that Baker had suffered. The trial court postponed its ruling on the admissibility of the titer test evidence until a voir dire of the Trust's experts could be conducted.

Trial began in November 1997. Since the Trust's experts were not immediately available, the district court first allowed the Trust to assert in opening argument its intention to offer evidence in support of its alternative causation theory, namely, that Baker's PID was caused by chlamydia. The district court also allowed the Trust to cross-examine Baker's first witness, gynecologist Dr. St. John,

---

1. The chlamydia titer test involves the detection of chlamydia antibodies in the blood of the subject. Their presence, above a certain concentration, is considered evidence of exposure to or infection by chlamydia at some earlier time.

Baker was not tested for chlamydia in her 1970s examinations, apparently because the prevalence of the disease was not then recognized and tests for it were less sophisticated.

regarding the Trust's alternative causation chlamydia theory.

On the second day of trial and outside the presence of the jury, the district court heard the voir dire testimony of Dr. Richard Jones, another of the Trust's expert gynecologists. Dr. Jones explained (as more fully set forth below) why he believed that Baker's PID had been caused by chlamydia and not by the IUD and why the positive 1996 chlamydia titer tests reinforced his opinion. Following the voir dire testimony, the district court granted Baker's motion to exclude any reference by Dr. Jones to chlamydia or the 1996 titer tests.

The district judge said that the opinion Dr. Jones had presented in voir dire regarding the alternative causation chlamydia theory "strikes [the court] as being nothing more than a guess." In later references to this issue, which recurred throughout the trial in relation to different pieces of evidence, the district court stated that there was no "basis" for discussing the theory. On one occasion, the court remarked that the evidence relating to chlamydia was more prejudicial than probative and suggested that direct testimony by Dr. Jones on this topic would "inject ... sexual innuendo" into the trial.

Thereafter, the district court barred the Trust's experts, Drs. Jones and Minkin, from testifying about chlamydia, and barred the Trust's counsel from cross examining Baker's principal medical expert, Dr. Phillip Stubblefield, on the issue of chlamydia as an alternative cause of the PID. By closing arguments, the district court had completely barred the Trust's counsel from mentioning the word "chlamydia," and restricted counsel from referring either to his earlier cross examination of Dr. St. John on chlamydia or to Baker's medical records regarding the trichomonas that appeared in the 1972 Pap smear, both of which were already in evidence.

Prior to reaching a verdict, the jury asked the district judge several questions about the medical records in evidence that described the presence of trichomonas in 1972. These questions appeared to refer to the issues surrounding the Trust's alternative-causation argument based on chlamydia. Following deliberations, the jury returned a verdict for Baker on the issue of causation and awarded damages of $175,000.

The district court entered a judgment for $175,000 in damages and $365,802.73 in prejudgment interest. The Trust moved to modify the judgment by striking the prejudgment interest on the ground that the United States Bankruptcy Court for the Eastern District of Virginia had sole jurisdiction over whether prejudgment interest could be awarded to Dalkon Shield plaintiffs under the A.H. Robins Co., Inc. plan of reorganization. The motion was denied by the district court. This appeal followed.

■ In this court, the Trust argues that the district court committed reversible error in effectively excluding its entire alternative causation defense from trial by restricting or barring direct expert opinion testimony, by excluding scientific evidence, and by limiting cross examination of plaintiff's expert witnesses. The Trust also argues that the district court improperly awarded prejudgment interest. We agree on the first point and remand for a new trial; on the second point, Baker now is contending that the issue should be resolved in accordance with the decision in a related Fourth Circuit case.

■ The trial court has broad discretion in determining issues of admissibility of expert testimony and scientific evidence, *see United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995), as well as in ruling on specific questions regarding cross examination of witnesses, *see Nickerson v. G.D. Searle & Co.*, 900 F.2d 412, 421 (1st Cir.1990). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court observed:

> Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.

*Id.* (Citations and internal quotations omitted.)

■ It is commonly said that a trial judge's decision regarding the admissibility

of expert testimony will not be disturbed absent a clear abuse of discretion. *See DaSilva v. American Brands, Inc.*, 845 F.2d 356, 361 (1st Cir.1988). This formulation is adequate to our case which involves judgments of balancing and degree as to relevance, prejudice and the like. It is useful to note, however, that admissibility of evidence issues can also turn on abstract questions of law, where review is de novo, *see United States v. Omar*, 104 F.3d 519, 522 (1st Cir. 1997), or on findings by the judge of specific facts, where review is for clear error, *see Mitchell v. United States*, 141 F.3d 8, 17 (1st Cir.1998).

 In a product liability action, the burden of proving causation rests on the plaintiff, but the defendant may—in addition to disputing the plaintiffs' affirmative showing—present evidence showing that some *other* cause accounts for the injury. *Cf. Wilder v. Eberhart*, 977 F.2d 673, 676 (1st Cir. 1992), *cert. denied*, 508 U.S. 930, 113 S.Ct. 2396, 124 L.Ed.2d 297 (1993); *Nickerson*, 900 F.2d at 420. Of course, a claim of alternative causation is not a free ticket to admission of evidence; an alternative causation theory could be incoherent or irrational, or the evidence supporting it inadmissible. *See Craig v. A.H. Robins Co., Inc.*, 790 F.2d 1 (1st Cir.1986). But a plausible theory of alternative causation, supported by admissible evidence, may be highly probative, particularly where the plaintiff's own theory of causation rests on inference or is otherwise open to debate. *See Wilder*, 977 F.2d at 676–77; *Swajian v. General Motors Corp.*, 916 F.2d 31, 34–35 (1st Cir.1990).

This takes us to the evidence at hand. To be admissible, evidence must of course be relevant; it must meet special requirements if presented as expert testimony (*e.g.*, the expert must be qualified and the subject must be fit for expert testimony); and it can be excluded if its unfair prejudicial effects substantially outweigh its probative value. *See* Fed.R.Evid. 401, 702, 403. We consider first whether the evidence in question was admissible apart from Rule 403 and then turn to the issue of undue prejudice.

The first excluded evidence was the testimony of Dr. Jones. Dr. Jones would have testified at trial that in his opinion, chlamydia caused Baker's PID, and he would have explained the reasons for his opinion. During voir dire outside of the presence of the jury, Dr. Jones testified that he based his opinion on the fact that Baker had PID; that scientific studies reveal that the most common causes of PID are gonorrhea and chlamydia; that Baker's PID was not of the acute kind caused by gonorrhea and there was no evidence of gonorrhea; and that chlamydia was the most common other cause of PID. He therefore offered his opinion to a reasonable degree of medical certainty that chlamydia had caused Baker's PID and resulting injury.

Dr. Jones said that his opinion was reinforced by the fact that Baker's medical records revealed the presence of trichomonas, a sexually transmitted disease, in 1972, because the presence of one sexually transmitted disease tends to be correlated with the presence of others, such as chlamydia. He said that Baker's specific medical injuries from PID were consistent with damage caused by chlamydia. Finally, he testified that his diagnosis was strengthened by, but not dependent on, the 1996 chlamydia titers that indicated Baker had been infected with chlamydia at some time. Baker has not challenged Dr. Jones' credentials as an expert or the suitability of the issue for expert testimony. Prejudice aside, the only remaining questions are whether the testimony is "relevant" to an issue in controversy, Rule 401, and rests on scientific basis, Fed.R.Evid. 702; *Daubert*, 509 U.S. at 594–95, 113 S.Ct. 2786. We start with the latter issue.

Dr. Jones' testimony was based on a standard scientific technique, widely used in medicine, of identifying a medical "cause" by narrowing the more likely causes until the most likely culprit is isolated. Of two very likely causes of PID, Dr. Jones eliminated one strong possibility (gonorrhea) because its symptoms are ordinarily more serious and no indication of gonorrhea was found. The other likely cause (chlamydia) he deemed more probable because Baker's symptoms were typical of this cause, she had another sexually transmitted disease in 1972 (there is some coincidence of such diseases), and she showed

antibodies in 1996 indicating infection with chlamydia itself at some earlier time.

Why this opinion should be regarded as "guesswork" or without "basis" (the district court's terms) is nowhere explained either by the judge or by Baker's brief on appeal. Dr. Jones' opinion rests on a scientific method, as required by Rule 702 as construed in *Daubert*, 509 U.S. at 592–95, 113 S.Ct. 2786. Indeed, "differential diagnosis" is a standard medical technique. *See, e.g., In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 755 (3d Cir.1994), *cert. denied*, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). Baker has not argued that any of Dr. Jones' scientific premises (*e.g.*, that chlamydia is a common cause of PID) was so faulty that it could not even be tendered to the jury for its consideration.

Similarly, the testimony is self-evidently relevant to the case at hand; it offers a scientific explanation directly pertinent to the central issue in the case, namely, whether the Dalkon Shield IUD caused Baker's injury, *see* Fed.R.Evid. 401; *Daubert*, 509 U.S. at 591–92, 113 S.Ct. 2786. Even allowing for the unlikely event of dual causation, proof that chlamydia probably caused Baker's PID obviously reduces the likelihood that the IUD did so. Dr. Jones could only assert chlamydia as the cause to a reasonable degree of medical certainty, but little in diagnosis is certain, *cf. Daubert*, 509 U.S. at 590, 113 S.Ct. 2786, and Rule 401 merely requires that evidence make a contested fact more likely than it would be without the evidence (not "more likely than not").

Of course, Dr. Jones' opinion rests in some measure on his view that the IUD could not have been the cause, but the district judge himself agreed that *that* opinion was one for the jury to weigh. Nor is it of any importance that the jury implicitly rejected this premise when it returned a verdict for Baker: the jury's own conclusion was reached without knowledge that an alternative explanation existed. Further, even if one assumed that the IUD could be an alternative cause, knowledge of an alternative cause might have persuaded the jury that Baker had not proved her claim by a preponderance of evidence.

Dr. Jones also relied on the 1996 titer tests showing chlamydia antibodies in Baker's blood. But while the admissibility of the tests themselves as evidence presents a separate issue, Dr. Jones said that his ultimate opinion did not depend on the tests. Nor would exclusion of the tests from the jury's consideration have prevented Dr. Jones from relying upon them in forming his own opinion—although it might have led to limitations on his testimony—since the main criterion for the facts considered by the expert is what is customary in the scientific community. *See* Fed.R.Evid. 703.

The district court also excluded Dr. Minkin's testimony that chlamydia was the likely cause of Baker's injury. Her testimony was largely parallel to that of Dr. Jones, although she was also prepared to say why Baker's PID symptoms did not correspond to symptoms that IUDs could cause and to address Baker's apparent ectopic pregnancy in 1991. The district court's exclusion of Dr. Minkin's testimony seemingly depended on the same grounds given for excluding Dr Jones' testimony. We believe that the exclusion was in error for the reasons already stated.

Because the district court also barred the Trust from cross-examining Baker's expert, Dr. Stubblefield, on the issue of chlamydia for similar reasons, we find this ruling was also in error.

■ The more difficult question is whether the 1996 titer tests were admissible as evidence for consideration by the jury. These tests were the only targets of Baker's pretrial motion. When the ruling on the motion was deferred, the district court shifted attention to Dr. Jones' entire alternative-causation testimony of which the 1996 titer tests were only a part. The tests appear to have been excluded in the wake of the decision to exclude the expert witness testimony, without which the titer tests would have made no sense.

On appeal, Baker adverts briefly (it would be too much to say that the point is fully argued) to the notion that the tests were too remote in time, because they had occurred in 1996 and the relevant question was whether Baker's PID in the 1970s had been caused by

chlamydia. Although the district court did not rest on this ground in excluding the evidence, the objection was raised by Baker in the district court in the *in limine* motion. It is also likely to recur in a retrial made necessary by the mistaken exclusion of the expert testimony.

The proof that Baker had chlamydia at some point prior to 1996 is obviously "relevant" under Rule 401 since it makes it more likely than it would be without such evidence that she had chlamydia in 1970 or 1975. Although the inference that Baker had chlamydia during the 1970s is obviously weakened by the time gap, the titer tests were not the only basis for the inference: rather, they were one piece in a mosaic that included chlamydia as a prominent cause of the symptoms admittedly suffered by Baker, the coincident presence of another sexually transmitted disease diagnosed in 1972, and Dr. Jones' expert opinion that other possible causes of Baker's symptoms did not fit.

Of course, the district court enjoys reasonable discretion in determining whether evidence, although relevant, should be excluded because its probative value is "substantially" outweighed by the potential to confuse or mislead the jury. *See Shay,* 57 F.3d at 132. Time disparities sometimes do lead to the exclusion of evidence on this ground. *Cf.* Fed.R.Evid. 609 (excluding evidence of past convictions over ten years old). However, in this case the "confusion" risk is pretty limited since it would be relatively easy for Baker's counsel to cross-examine on the issue and explain to the jury the significance of the time interval. *Cf. Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

■ This brings us to the final objection to both the expert testimony and the titer tests: Baker's claim that the evidence was properly excluded on the ground that its probative value was substantially outweighed by its likelihood of causing unfair prejudice to Baker. Fed.R.Evid. 403. Baker invoked this rubric in her *in limine* motion objecting to titer tests, and the district judge adverted to it generally. Whether it was an intended ground for excluding any of the evidence is not perfectly clear, but it is argued to us on appeal, and we expressly reject it.

On the probative value side of the balance, there is no doubt whatever that the expert testimony, reinforced somewhat by the titer tests, was quite important to the defense and had substantial probative value if the defense experts were believed. It is all very well to say, as Baker does, that the defense is free to assert that the IUD was incapable of causing PID, or at least did not cause it in this case. But the opportunity to offer one line of evidence does not justify excluding a different, reinforcing line—and many would think that in this case the chlamydia theory was a more concrete and affirmative explanation as to why the defense should prevail. *Cf. Wilder,* 977 F.2d at 676; *Swajian,* 916 F.2d at 34–35.

We recognize that the unexplained attribution to a party of a sexually transmitted disease could have some potential for prejudice. But in this case it would be easy to bring out on cross-examination that chlamydia is widespread, is easily contracted and is not intrinsically a mark of promiscuity. In this context, we see little indication of unfair prejudice from the evidence, let alone unfair prejudice "substantially" outweighing the probative value of the expert and test evidence, as Rule 403 requires.

This case bears no resemblance to *Craig v. A.H. Robins Co., Inc.,* 790 F.2d 1 (1st Cir. 1986). There, the evidence excluded was of *multiple sexual partners* offered simply to suggest an increased risk of infertility from non-IUD causes. The probative value of the testimony was limited; but, far more important, the testimony was itself highly suggestive of promiscuity, presenting an entirely different situation.

The final issue in the case is the Trust's challenge to the district court's award of prejudgment interest. The Trust claims that the award is inconsistent with a ruling of the federal bankruptcy court having jurisdiction over the plan of reorganization under which the Trust was created. According to the Trust, the bankruptcy court has determined that prejudgment interest is not recoverable under the plan.

In its answering brief, Baker agreed with the Trust that the issue should be resolved in accordance with the Fourth Circuit decision

reviewing the bankruptcy court's ruling. The Fourth Circuit, we have just been told, has upheld the bankruptcy court. *In re A.H. Robins Co., Inc.*, No. 98–1080 slip op., 1998 WL 637401 (4th Cir.1998). We therefore treat the issue as resolved for purposes of this case by agreement of the parties.

The judgment of the district court is *vacated* and the matter is *remanded* for a new trial consistent with this opinion.

*It is so ordered.*